

**ROBERT A. GORDON**
**U.S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

| | | |
|---|---|---|
| In re: | * | |
| Rebecca Patchell | * | Case No. 15-15073-RAG |
| Debtor | * | Chapter 7 |
| * * * * * * | * | * * * * * * |
| Conestoga Title Insurance Company | * | |
| Plaintiff | * | |
| v. | * | Adv. No. 15-00243 |
| Rebecca Patchell and Lowell McCoy | * | |
| | * | |
| Defendants | * | |
| * * * * * * | * | * * * * * * |

**MEMORANDUM OPINION IN SUPPORT OF ORDER**
**DISMISSING COMPLAINT AND ENTERING**
**JUDGMENT IN FAVOR OF THE DEFENDANTS**

**I.      Preliminary Statement**

The questions presented for determination are (1) whether the Debtor/Defendant,

Rebecca Patchell committed fraud as to the Plaintiff, Conestoga Title Insurance Company

1

(Conestoga Lancaster) with respect to the settlement of the sale of her personal real estate such that her potential liability to Conestoga Lancaster should be excepted from her discharge and (2) whether, after the passage of well over three years since Conestoga Lancaster's claim accrued, the non-debtor Defendant Lowell McCoy can be held liable on the basis of his unsealed Guaranty of Payment and Performance (Guaranty).  The answer to both questions is 'no'.

## II.    <u>Factual History</u>

Conestoga Lancaster is a Title Insurance Company that acts as an underwriter and insurer of real estate titles situate in Maryland and Pennsylvania.  Trial Transcript at 21 (Tr. at ___).  Its principal place of business is Lancaster, Pennsylvania and the policies it issues are written through a network of independent agents.  *Id*.  In August of 2005, Ms. Patchell and Mr. McCoy purchased Conestoga Title Company, Inc. (Conestoga Elkton), an already operating title agency based in Elkton, Maryland.  At that time, Ms. Patchell had significant years of experience in supervising and managing the practical aspects and legwork of conducting settlements and insuring titles and Mr. McCoy had the wherewithal to pay the purchase price of over $1 million, which he did.  They agreed that Ms. Patchell's investment would be to operate and manage the business with Mr. McCoy content to remain a passive owner.  Tr. at 58-59.[1]

On August 31, 2005, Conestoga Elkton entered into an Agency Agreement (Agreement) with Conestoga Lancaster.  Plaintiff's Exh. 1 (Pl. Exh. __).  The Agreement appointed Conestoga Elkton as Conestoga Lancaster's agent, and granted Conestoga Elkton the authority to write title insurance for real estate transactions, subject to the Agreement's terms.  *Id*; Tr. at 21. Ms. Patchell signed the Agreement on behalf of Conestoga Elkton and Mr. McCoy witnessed her signature.  The same day, Ms. Patchell and Mr. McCoy both signed the Guaranty in favor of

---

[1] Conestoga Elkton had been an agent of Conestoga Lancaster under its prior ownership.  Tr. at 60.  Despite the similarity in their names, the parties emphasized that Conestoga Lancaster and Conestoga Elkton are entirely separate and do not have any economic or ownership interest in each other.

Conestoga Lancaster. Pl. Exh. 2. Per the Guaranty, Ms. Patchell and Mr. McCoy each guaranteed "the full performance of the [Agreement] by [Conestoga Elkton] [including] the payment of premiums, indemnifications and claims of loss. . .." *Id.*

In 2007, Ms. Patchell agreed to sell real estate that she personally owned at 18 Guilford Court, North East, Maryland 21901 (Guilford Court) to a Mr. Wayne Powell. Prior to the sale, Guilford Court was encumbered by two liens and attendant debt. The senior lien was held by NBRS Financial (NBRS) and by the time settlement occurred, a total payoff amount of $219,720.86 was due and owing. The junior lien was held by Cecil Bank (locally owned and operated in Elkton) and the corresponding indebtedness was in the original principal amount of $150,000.00 (Cecil Bank Lien). Pl. Exhs. 17 and 19. It is unclear what the total payoff amount on the underlying indebtedness was at the time of the now 10 years old settlement. This is so because in lieu of payment, Cecil Bank agreed to release and transfer the lien to other, substitute real estate collateral also personally owned by Ms. Patchell. Cecil Bank's decision to do so opened the way for Ms. Patchell to receive the proceeds of sale, net of what was owed to NBRS. Yet, Cecil Bank's post-settlement change of heart is what ultimately led to this litigation.

Mr. Donald Delgado testified at trial on behalf of Conestoga Lancaster. Mr. Delgado began his employment with the Plaintiff in 1993 and is its Vice-President of Agency Administration. Tr. at 20. He knew Ms. Patchell before this transaction unfolded and was directly involved in the pre-litigation events. He testified that the general scope of his employment requires him to be, "primarily in charge of supporting our agents and auditing them to ensure that they're doing what they're supposed to be doing under our agency agreement." *Id.*. He acknowledged that Conestoga Lancaster agreed to insure Mr. Powell's title prior to the sale of Guilford Court. Conestoga Lancaster also agreed to allow Conestoga Elkton to conduct

the settlement, notwithstanding Ms. Patchell's direct, personal stake in the outcome.  He gave the

following direct testimony on that point:

> Q (by Mr. Malloy):  So if Ms. Patchell, through her settlement
> company, wants to get to settlement on a property that she owns an
> ownership interest in it is not prohibited under the Agency
> Agreement?
>
> A (by Mr. Delgado):  Correct.
>
> Q:  But it is treated somewhat differently?
>
> A: Correct.
>
> Q:  Explain how it is treated differently.
>
> A:  Well, we to provide comfort to all the parties involved,
> including the lender, the seller that there's no impropriety, and
> even ourselves, we like to just supervise the transaction to give that
> comfort that there's no impropriety since the seller, in this case
> Ms. Patchell, was going to be receiving a large sum of money
> according to the HUD-1 settlement statement when all funds are
> disbursed.
>
> Q:  … So your company, Conestoga Title Insurance, you are not
> conducting the settlement?
>
> A:  Correct.
>
> Q:  You are disbursing the funds?
>
> A:  In this case we required that the funds be disbursed by us.
> Again, to provide comfort to all of the parties involved that there is
> no impropriety.

Tr. at 29-30.

      Mr. Delgado acknowledged that Ms. Patchell followed the requirements of the

Agreement by giving him advance notice of the settlement once the date was set.  He then

testified that, "…I requested a copy of the preliminary HUD-1 settlement sheet prior to the

settlement and when she provided that I noticed there was only one of the two liens listed to be

paid off." Tr. at 29.  Mr. Delgado was then asked to describe his follow-up communications

with Ms. Patchell.

> Q (Mr. Malloy):  And then so this was a fax you received from Ms. Patchell?[2]
>
> A:  Yes.
>
> Q:  …And it includes wiring instructions for Conestoga [Lancaster] to wire the funds to her bank account?
>
> A:  Yes.
>
> Q:  And do you remember, was this the first time that you recall seeing the HUD-1 Statement?
>
> A:  Yes.
>
> Q:  And look through the HUD-1 Statement.  You see it is only the first loan that is listed to be paid off?
>
> A:  Correct. On line 504 on the Seller's section of the transaction it's listing a payoff to NBRS Financial for $219,000.
>
> Q:  And this caused you to ask about the second loan?
>
> A:  Correct.  I noticed there was no payoff for the second loan and I inquired as to why that was, if there was a zero balance on it or what the case was.

Tr. at 31-32.

Ms. Patchell promptly responded via email to Mr. Delgado's question about the second

loan:

> A:  (Mr. Delgado) Her reply was that she was switching collateral from Guilford to Cherokee,[3] that [Cecil Bank] is releasing Guilford. She just called Sandy at [Cecil Bank] and asked her to forward something in writing.  She said she knew that I would need that and she should have requested it already.

---

[2] The fax is Pl. Exh. 12.

[3] "Cherokee" is 15 Cherokee Drive, North East, MD (Cherokee), also owned by Ms. Patchell in 2007.

Q:  And so do you see the next day, it is April – well, it is the same day I guess.  There was an email forwarded to you from a bank employee?

A:  Right, that's on – it looks like on April 25th there was an email from Ms. Sandy Feltman at Cecil Bank to Ms. Patchell explaining – the email says that [Cecil Bank] will release the lien on [Guilford Court] for no consideration and [Cecil Bank] will be recording an IDOT on [Cherokee].  And that email was forwarded to me the next day, April 26th.

Tr. at 32-33.

At the time, Ms. Feltman was employed by Cecil Bank as its Senior Vice-President and Director of Lending.  The April 25, 2007 email thread referred to by Mr. Delgado between he, Ms. Patchell and Ms. Feltman reads as follows:

*Email sent to Ms. Patchell by Mr. Delgado at 1:13 p.m.:*

Beckie,

Is there a $0.00 balance with your IDOT to Cecil Federal? Can you fax something to me showing that and that it will be or has been satisfied?

Thanks
Don

*Reply email sent at 1:19 p.m. to Mr. Delgado by Ms. Patchell:*

I am switching collateral from Guilford to Cherokee.  Cecil Bank is releasing Guilford.  I just called Sandy and asked her to forward something in writing to me.  I knew you would need that.  Should have requested already.  It slipped my over-loaded mind!!!

I'll forward to you ASAP!!!!
Thanks!!
Beckie

6

*Email sent at 5:10 p.m. from Ms. Feltman to Ms. Patchell:*

Cecil Bank will release the lien on 18 Guilford Ct, North East, MD for no consideration.  Cecil Bank will be recording an IDOT on 15 Cherokee Dr., North East, MD.

Pl. Exh. 8.

The direct examination of Mr. Delgado continued:

Q (Mr. Malloy):  And so did you hear anything else from Ms. Patchell or receive any other documentation prior to the settlement?

A:  Not prior to settlement.  We would have received the funds from the bank.

Q:  Did you disburse those funds in accordance with the instructions from Ms. Patchell?

A:  Yes.

Q:  … And so do you know approximately how much was disbursed to Ms. Patchell?

A:  She received proceeds in the amount of $118,079.40.[4]

Q:  And the loan to Cecil Bank was never paid off?

A:  That is correct.  Not at the time of settlement.

Q:  Did [Conestoga Lancaster], through Ms. Patchell, issue a title insurance commitment for this transaction?

A:  Yes.  Ms. Patchell, her agency [Conestoga Elkton] issued a commitment prior to the settlement and then they issued policies after the settlement.

Tr. at 33-34.

Settlement was held on April 30, 2007 in Conestoga Elkton's office after Mr. Delgado confirmed that "everything looked fine."  Tr. at 63.  On the day of settlement, Ms. Patchell neither had a signed release of the Cecil Bank Lien nor a new deed of trust to secure Cecil

---

[4] Ms. Patchell testified that this money was used for various business and personal expenses.  Tr. at 65.

7

Bank's debt with Cherokee.[5]  Tr. at 34–35 and 63.  Nevertheless, Mr. Delgado released the

settlement funds to pay NBRS Financial, miscellaneous settlement costs and the net proceeds of

$118,079.40 to Ms. Patchell in accordance with the HUD-1 settlement sheet.  Likewise, the title

policy was subsequently issued in favor of Mr. Powell.  Tr. at 34; Pl. Exh. 9.

By July 27, 2007, Mr. Delgado still had not received either a signed release or a deed of

trust from Ms. Patchell.  He emailed her and informed her that the Cecil Bank Lien was still

recorded against Guilford Court and she needed to see that it was released.  Trial Tr. 35; Pl. Exh.

7.  She replied via email about 20 minutes later and wrote:

> Hey!!
>
> Things are going.  Jeez!! You and Janet!!  She actually reminded
> me 2 days ago that I need to stop by Cecil Bank to sign the transfer
> stuff and get my release!!!!  My fault totally.  Been busy solving
> the world's problems!!  I promise I will get over there AFTER the
> end of the month!!!  Okay?
>
> Thanks!
> Beckie

Exh. 7.

Ms. Patchell gave direct testimony as follows with respect to her subsequent attempts to

get Cecil Bank to provide the release and transfer its lien to Cherokee:

> Q (Mr. Emery):  … Did you raise the issue that she had emailed
> you after consulting with Mary Halsey, president of the bank, that
> they were going to release Guilford Court for no consideration and
> substitute other property?
>
> A (Ms. Patchell):  I asked a million times in person and over the
> phone –

---

[5] Ms. Patchell asserted that it was Cecil Bank's responsibility to prepare the release and substitute deed of trust while Ms. Feltman testified that the settlement agent would normally do so.  The Plaintiff stresses that Conestoga Elkton's (Ms. Patchell's) failure to prepare these documents was negligent at best and fraudulent at worst. However, the Court concludes this question is not crucial to a proper resolution, in light of the industry standards at the time as capsulized in Ms. Feltman's testimony and Ms. Patchell's unrebutted testimony as to her post-settlement efforts to get the documents from Cecil Bank.

Q:  Well let - - not a million times.

A:  Well, I'm sorry, that's true.  It's an exaggeration.  Because I actually would go to Cecil Bank all the time to help Mr. Fayer prepare title commitments and settlement sheets - - ... .

*      *      *

Q:  When did you first - - if you recall - - first contact Cecil Bank about where's the release and IDOT?

A:  I would speculate and say it had to be the following week sometime because I was probably there and saw Sandy for one reason or another.

*      *      *

Q:  Is it fair to say you did contact the bank on several occasions inquiring as to where these documents [sic]?

A:  Absolutely.

Q:  Do you recall what you were told?

A:  Sandy, [sic]"Bec, we'll get to it.  It's busy. I'm doing a million things.  I'll get to it.  I promise."

Tr. at 73-75.

Ultimately, Cecil Bank neither provided the promised release nor accepted Cherokee as substitute collateral.  On October 29, 2007, Steven Fayer, Esquire, Cecil Bank's counsel, sent a letter to David Burroughs, Esquire, who appears to have been representing both Ms. Patchell and Conestoga Elkton.  Pl. Exh. 14.  Mr. Fayer referred to Cecil Bank's prior promise to release its lien and accept substitute collateral, memorialized in Ms. Feltman's email, as a mere "agreement in principle".  He also indicated that, among other things, Cecil Bank had obtained an appraisal of Cherokee and had determined that the loan to value ratio was insufficient to permit substitution.  The letter does not include an explicit demand for payment from Ms. Patchell but it

9

does lay the responsibility for the problem on her and outlines Cecil's enforcement rights against

Ms. Patchell and Guilford Court under the loan documents.

Mr. Fayer's letter offers one explanation for Cecil Bank's rejection of the release and

substitution scenario.  In her testimony, Ms. Patchell offered an alternative account:

> Q (Mr. Emery):  … Do you know why [Cecil Bank] changed [its] position?
>
>                       *        *        *
>
> A (Ms. Patchell):  … Well, my initial contact was with Mary Halsey, face-to-face.[6]  My additional conversations after that were with Sandy Feltman.  Period.  As far as what they agreed to do. When Mr. Hughes called me and this whole thing blew up apparently Mr. Sposato found out that Mary had loaned me a line of credit and that we were looking to replace the collateral, she had agreed to it.  He was upset with me because I wouldn't sell him my title company.
>
> Q:  Was he negotiating with you to purchase that?
>
> A:  He had negotiated with Mr. McCoy for a period of time.  And then he claimed, came at me directly and said when you get rid of Mr. McCoy you come and see me, I'll take care of you.
>
> Q:  And what was your response?
>
> A:  No thank you.
>
> Q:  And was it shortly after that that Mr. Fayer's letter was sent to Mr. Burrows [sic]?
>
> A:  It wasn't very long.

Tr. at 76-77.

Thereafter, Cecil Bank filed a confessed judgment action against Ms. Patchell and

Conestoga Elkton but the judgment was set aside after Ms. Patchell testified to her reliance upon

Cecil Bank's representation that it would release and accept substitute collateral for the Cecil

---

[6] At the time, Ms. Halsey was Cecil Bank's President and CEO.

Bank Lien.  Plaintiff's Exh. 11; Plaintiff's Exh. 13 at 35.  Cecil Bank also took action against

Mr. Powell, the purchaser of Guilford Court.  Mr. Delgado explained what Cecil Bank did and

how that ultimately drew Conestoga Lancaster into the middle of that dispute.

> Q. (Mr. Malloy):  So what happened next with . . .the Cecil Bank
> loan?
>
> A (Mr. Delgado):  Well, it was in 2010 the purchaser, Mr. Powell,
> who was our insured, received a letter from Cecil Bank stating that
> this lien was never satisfied or released on his property.  That they
> intended to take whatever actions necessary to enforce that lien and
> collect their monies.

Tr. at 36.

In response to Cecil Bank's pressure, Mr. Powell filed a title insurance claim with

Conestoga Lancaster.  Mr. Delgado explained what happened next:

> A:  Well, a lien existed on one of our insured's property and the
> bank with that lien intended or advised our insured that they were,
> they had a lien on his property and under our policy we are
> obligated to defend his title because he has a policy stating that we
> will do that for him.  And that is one of the covered risks of the
> policy.
>
> Q:  (Mr. Malloy):  And so how did [Conestoga Lancaster]
> respond?
>
> A:  Well, we hired counsel to represent our company and they
> entered negotiations with Cecil Bank's counsel to resolve the
> claim.  And we negotiated an amount of $67,000 that Cecil Bank
> would receive in order to release the lien on our insured's property.

Tr. at 39.

Conestoga Lancaster paid that amount to Cecil Bank and the Cecil Bank Lien was

released from Guilford Court on January 31, 2013.  Pl. Exhs. 4, 5 and 22.  On June 24, 2013,

Conestoga Lancaster sent Ms. Patchell an email demanding that $67,000, plus attorney's fees of

$18,634.20, be paid to Conestoga Lancaster.  Pl. Exh. 3.  Ms. Patchell testified that Exhibit 3 was

the first notice she received of either Cecil Bank's assertion of a claim against Mr.

Powell/Conestoga Lancaster or any settlement/resolution activity between Cecil Bank and

Conestoga Lancaster.  Tr. at 69, 77-78.  The Agreement was terminated in January of 2010 after

Ms. Patchell advised Conestoga Lancaster that Conestoga Elkton was going out of business.  *Id*.

at 50.

      The parties took the deposition of Sandra Feltman on March 11, 2016 and the transcript

of her testimony was admitted into evidence as Defendant's Exhibit 1.  As regards the agreement

to release the Cecil Bank Lien against Guilford Court and substitute Cherokee as collateral, Ms.

Feltman testified as follows:

> Q (Mr. Emery): Do you have any specific recollection of [the
> Guilford Court] transaction with Ms. Patchell?
>
>       \*      \*      \*
>
> A (Ms. Feltman): She called, saying that she was selling her
> property on Guilford and that she wanted to change the collateral
> from that property to her personal residence on Cherokee.
>
>       \*      \*      \*
>
> A: She asked me if Cecil Bank would be willing to do so.  So at
> that time –
>
> Q:  What did you do then?
>
> A: I had to go to the president/CEO, Mary Halsey, for her
> permission.
>
> Q: Did you in fact do that?
>
> A:  Yes, I did.
>
>       \*      \*      \*
>
> A: I asked [Ms. Halsey].  She said Cecil Bank would be willing to
> do so and that it was okay to go ahead and contact [Ms. Patchell]
> through email that Cecil Bank was willing to do so.

Defendant's Exhibit 1 at 7-9 (Def. Exh. at __).

At that point in the deposition, Ms. Feltman was shown the email included as Plaintiff's

Exhibit 8 that she sent to Ms. Patchell.  She confirmed that the email was hers and that she sent

it.  Her testimony continued:

> Q (By Mr. Emery):  At that point in time who called the shots at
> Cecil Bank? Who was in charge?
>
> A:  Mary Halsey, President and CEO.
>
>             *       *       *
>
> Q: What was your belief with respect to the agreement to substitute
> collateral? Was it something that was going to happen?
>
> A:  Yes, because we had done that in the past for other customers.
> This was not – this was not extraordinary, you know.
>
> Q:  Let's back up a little bit. The real estate market in 2007, do you
> have a recollection of what was the market like back then, and if
> so, could you tell us?
>
> A:  The market was very busy.  A house would go on the market
> and it would sell within the week.  Interest rates were down.
> Loans were readily available to customers because a lot of lenders
> were doing no doc loans.
>
> Q:  What is a no-doc loan?
>
> A:  That is where a customer can just state what their income and
> debts are without actually having any verification of any income or
> debts.

Def. Exh. at 10-11.

Ms. Feltman was then asked about Cecil Bank's change of position:

> Q:  (Mr. Emery) Did there come a time when you learned that
> Cecil Bank was not in agreement with the substance of your April
> 25th, '07, email that collateral would be substituted?

13

A:  Well, I personally wasn't involved with that process, but, you know, in my capacity, I did hear that that was what was taking place.

Q:  Was the bank going through some changes at this time?  If so, what were they?

A:  In, you know, May, June, or July, that area, there was a situation between the president --

Q:  Ms. Halsey?

A:  - - and CEO, Mary Halsey, and the chairman of the board, Charles Sposato, where Charles Sposato took every decision-making capability away from Ms. Halsey and every decision was made by Mr. Sposato.

Q:  There came a time when the bank refused to honor the substance that was reflected in that April 25th, '07, email?

A:  That is my understanding, yes.

*        *        *

A:  …  There were a lot of - - there were some decisions, I cannot be specific, but I could see the trend where, you know - - in fact, sometimes Mr. Sposato would say something and then later down the road would change his mind.   And sometimes it would happen at a closing, you know.

*        *        *

Q:  Is it fair to say Mr. Sposato decided to run the whole show by himself or he was the ultimate authority?

A:  That's correct. We could not make any decisions without running everything past him.

*        *        *

Q:  And you've explained to us I guess the nature of the real estate industry, residential real estate industry at that point in time.  Is that how things worked normally or did they usually have these documents available at settlement?

A:  No. The release and everything were done after settlement.

14

Q:  How long, if you know?

A:  It depended on - - there wasn't any given amount of days or anything.  Whenever they came across - - whoever settled, you know, sent the documents for us to release.

Q:  Correct me if I'm wrong.  Settlement occurs.  Ultimately a title insurance policy is issued to the lender; is that correct?

A  Correct.

Q:  And keeping in mind the nature of the real estate industry in '07, were these title policies often issued before the releases were in hand and recorded, if you know?

A:  I would say in some cases, yes.

Q:  It would be fair to say it was customary back at that time in that real estate industry as if existed in '07 for things to occur sometimes months later that would enable someone to complete a file?

A:  Yes.

Q:  Was that the exception or the norm, if you can recall?

A:  That was probably the norm at that time because of the - - how the real estate market was going.

Q:  Were you at all surprised when Mr. Sposato put I guess the stop to the agreement that you and Mary Halsey had with Ms. Patchell? Did that surprise you?

A:  No, because nothing he did surprised me.

Q:  Was it solely because of Mr. Sposato that this substitution of collateral never occurred?

A:  That would be my understanding.  That's my belief.

Def. Exh. at 13-18.     Mr. McCoy was the final witness called to testify (as an adverse witness)

at trial.  The essence of his relevant testimony is capsulized in this exchange:

Q (Mr. Malloy):  Mr. McCoy, did you understand my question?

A: Would you state it again, please.

Q: As the guarantor of the Agency Agreement or for the losses under the Agency Agreement, claims of loss, wouldn't you be responsible for paying my client's loss that they've paid out in this matter?

A: Well, I signed this Agreement and what it says, so you don't have to keep asking me each one, just that's it.

Q: Is that a yes or a no or something?

A: I guess it's a yes.

Tr. at 89.

## III.    Procedural History

Ms. Patchell filed her Chapter 7 Petition on April 9, 2015. This Adversary Proceeding was commenced on May 13, 2015. Pre-trial proceedings went smoothly, save for the parties' failure to file pre-trial memoranda as required by the Pre-trial Order (Dkt. No. 14). Trial was held on March 23, 2016 (Dkt. No. 21). At the close of the Plaintiff's case, the Defendants' moved for judgment of dismissal under Bankruptcy Rule 7052. Tr. at 92. The Court agreed that on the surface, the evidence did not appear to support a claim for fraud against Ms. Patchell. Moreover, the claim for relief against Mr. McCoy was filed over seven years after the settlement of the sale of Guilford Court. The claim therefore seemed to have been filed well outside of the general three year limitations period applicable in Maryland, notwithstanding Mr. McCoy's candid admission of liability.[7] However, in the absence of pretrial memoranda and without a foundation of relevant law, the Court was reluctant to rule, then and there. Hence, a briefing

---

[7] The statute of limitations was raised as an affirmative defense on behalf of Ms. Patchell (Dkt. No. 12) but not on behalf of Mr. McCoy (Dkt. No. 7). It was also mentioned by the Court in the wake of the Defendant's motion for judgment. The parties each addressed the question of whether limitations applied on the merits in their post-trial papers without debating whether it had been waived.

16

schedule and oral argument date were set.  The papers were timely filed and argument was held

on June 14, 2016.  The matter is ripe for decision.

## IV.    Jurisdiction and Venue

This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C.

§§157(b)(1) and 1334 and Local Rule 402 of the United States District Court for the District of

Maryland.  The claim against Ms. Patchell presents a core proceeding pursuant to 28 U.S.C.

§157(b)(2)(I).  The parties, including the non-debtor Mr. McCoy, have consented to the entry of

a final judgment on the merits and therefore this Court finds that the entry of a final judgment

will not offend the strictures of *Stern v. Marshall,* 564 U.S. 462 (2011) and is in compliance with

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015) (holding that parties may

knowingly and voluntarily consent to adjudication of a claim by the Bankruptcy Court).  Venue

is proper under 28 U.S.C. §1409(a).

## V.    Legal Standards

1.      *11 U.S.C. §§ 523(a)(2)(A) and (a)(4) and Bankruptcy Rule 7052.*

Conestoga Lancaster relies upon 11 U.S.C. §§523(a)(2)(A) and 523(a)(4) as the bases for

Ms. Patchell's alleged liability.[8]  Its contention is that before she consummated the settlement,

Ms. Patchell had an affirmative duty to disclose to Mr. Delgado that she did not yet have a

release and substitute deed of trust from Cecil Bank.  Conestoga Lancaster avers that because she

did not make that disclosure, she committed a fraudulent misrepresentation by omission.

Conestoga Lancaster likewise contends that even if she did not commit fraud, her, at a minimum,

negligent, breach of contract will suffice to support a claim of defalcation in a fiduciary capacity.

Section 523(a)(2)(A) and (a)(4) provide, in material part:

---

[8] Unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code) found at Title 11 of the United States Code and all rule citations are to the Federal Rules of Bankruptcy Procedure (Rules).

      (a)  A discharge under section 727 … does not discharge an
          individual debtor from any debt—

      (2) for money, property, services, or an extension, renewal, or
      refinancing of credit, to the extent obtained by—

          (A) false pretenses, a false representation, or actual fraud,
          other than a statement respecting the debtor's or an insider's
          financial condition…

                    *       *       *

      (4) for fraud or defalcation while acting in a fiduciary capacity,
      embezzlement, or larceny…

      The exceptions to discharge enumerated in Section 523 are construed narrowly in order

to "protect the purpose of [the Bankruptcy Code of] providing debtors a fresh start." *In re*

*Gordon*, 491 B.R. 691, 697 (Bankr. D. Md. 2013) (citations omitted).  Whether a creditor attacks

from the vantage point of Section 523(a)(2)(A), or (4), the burden is on the creditor to establish

by a preponderance of evidence that a debt is non-dischargeable.  *Kubota Tractor Corp. v. Strack*

(*In re Strack*), 524 F.3d 493, 497 (4th Cir. 2008) (citing *Grogan v. Garner*, 498 U.S. 279, 291,

111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)).  A Plaintiff's case must satisfy five elements in order

to prevail under Section 523(a)(2)(A).  *Grogan v. Garner*, 498 U.S. 279, 287-288 (1991)*;*

*Nunnery v. Rountree (In re Rountree),* 478 F.3d 215, 218 (4th Cir. 2007); *Dubois v. Lindsley (In*

*re Lindsley)*, 388 B.R. 661, 668 (Bankr. D. Md. 2008).  Those elements are: (1) that the

defendant made a representation, (2) that the defendant knew at the time the representation was

made that it was false, (3) that the defendant made the representation with the intent and purpose

of deceiving the plaintiff, (4) that the plaintiff justifiably relied upon the false representation and

(5) that the plaintiff suffered damages as a proximate result of the representation.  *Lindsley*, 388

B.R. at 668.  The debtor's intent shall be determined subjectively with the totality of the relevant

circumstances taken into account.  *Rembert v. AT&T Universal Card Servs. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998); *In re Pleasants*, 231 B.R. 893, 898 (Bankr. E.D. Va. 1999), *aff'd*, 219 F.3d 372 (4th Cir. 2000).  The standard of reliance under Section 523(a)(2)(A) is the lesser one of justifiable (as opposed to reasonable) and that element is also to be assessed in accordance with the overall circumstances of the case.  *Field v. Mans*, 516 U.S. 59, 73, 116 S. Ct. 437, 445, 133 L. Ed. 2d 351 (1995); *Colombo Bank v. Sharp (In re Sharp)*, 340 F. App'x. 899, 906, 2009 WL 2480841, at *5 (4th Cir. 2009).[9]

Section 523(a)(4) excepts from discharge debts that arise from, "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. §523(a)(4).  In order to prevail under this subsection, the creditor must prove, "(1) the establishment of an express trust regarding the funds, (2) that the debtor acted in a fiduciary capacity and (3) the debt is based upon the debtor's fraud or defalcation while acting as a fiduciary."  *In re Gordon*, 491 at 697.  However, just as with claims under Section 523(a)(2)(A), proof of an intentional wrong is required.  As stated by the Supreme Court in *Bullock v BankChampaign, N.A.*, 133 S. Ct. 1754, 1759-60 (2013):

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong.  We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. . . . Where actual knowledge of wrongdoing is lacking, we consider

---

[9] A convincing case could be made that Conestoga Lancaster may not rely upon Section 523(a)(2)(A) but instead must look to Section 523(a)(2)(B) because the essential question - whether the Cecil Bank Lien was recorded against Guilford Court, or, released and transferred to Cherokee - was one respecting the Debtor's financial condition.  *See Engler v. Van Steinburg, (In re Van Steinburg)* 744 F.2d 1060, 1061 (4th Cir. 1984); *Blackwell v. Dabney*, 702 F.2d 490, 491 (4th Cir. 1983).  The Court suggested this at trial and during oral argument but Conestoga Lancaster has chosen to rely upon Subsection (a)(2)(A).  If Section 523(a)(2)(B) does apply Conestoga Lancaster would have had to have relied upon a written statement of Ms. Patchell to its detriment.  *Id.*  The prime analytical difference would then be the governing reliance standard, 'reasonable' instead of 'justifiable'.  However, because the Court cannot find that Ms. Patchell acted with fraudulent intent (a requisite of both) the subtleties and nuances of which standard should apply need not be explored.

> conduct as equivalent if the fiduciary "consciously disregards" (or
> is willfully blind to) "a substantial and unjustifiable risk" that his
> conduct will turn out to violate a fiduciary duty. … That risk "must
> be of such a nature and degree that, considering the nature and
> purpose of the actor's conduct and the circumstances know to him,
> its disregard involves a gross deviation from the standard of
> conduct that a law-abiding person would observe in the actor's
> situation."

*Bullock* settled the conflict among the Circuits as to whether a finding of intentional, or

merely negligent, conduct was necessary to except from a fiduciary's discharge a debt that arose

from the violation of an express trust.  In deciding that evidence of intentional conduct is

necessary, the Court rejected the holding of *Rwanda v Uwimana (In re Uwimana)*, 274 F.3d 806

(4th Cir. 2001) (relied upon by Conestoga Lancaster) and other like decisions.

Rule 7052 incorporates Federal Rule of Civil Procedure 52.  FRCP 52(c) governs the

entry of judgment upon partial findings.  The Rule provides:

> If a party has been fully heard on an issue during a nonjury trial
> and the court finds against the party on that issue, the court may
> enter judgment against the party on a claim or defense that, under
> the controlling law, can be maintained or defeated only with a
> favorable finding on that issue. . . . A judgment on partial findings
> must be supported by finding of fact and conclusions of law as
> required by Rule [7052].

"A district court sitting without a jury may enter judgment as a matter of law against a

party on any claim once the party has had a full opportunity to present evidence on that claim."

*Carter v. Ball*, 33 F.3d 450, 457 (4th Cir. 1994).  A Rule 52(c) motion for judgment may be

entered, as long as the non-moving party has been fully heard with respect to an issue essential to

that party's case.  *EBC, Inc. v. Clark Bldg. Sys., Inc.,* 618 F.3d 253, 272 (3d Cir. 2010); *Morales*

*Feliciano v. Rullan*, 378 F.3d 42, 59 (1st Cir. 2004).  "In considering whether to grant judgment

under Rule 52(c), the district court applies the same standard of proof and weighs the evidence as

it would at the conclusion of the trial".  *EBC, Inc.*, 618 F.3d at 272 (citations omitted).  Thus,

"the court does not view the evidence through a particular lens or draw inferences favorable to either party". *Id.*. The Court has evaluated the evidence submitted during Conestoga Lancaster's case and has concluded that judgment for the Defendants under Rule 7052 is proper and should be entered.

> 2.    *The Maryland Statute of Limitations*

In Maryland the general statute of limitations for a civil action, including an action on a simple contract, is three years from the date the action accrues. Md. Cts. & Jud. Proc. Code Ann. § 5-101; *McMahon v Dorchester Fertilizer Co.*, 184 Md. 155, 157-158 (1944). However, relying upon the sealed Agreement (and not the Guaranty) as the primary document that governs Mr. McCoy's rights, Conestoga Lancaster looks to Md. Cts. Jud. Proc. Code Ann. § 5-102(a)(5) which provides a twelve (12) year limitations period for agreements under seal. With that additional period of time, Conestoga Lancaster asserts the Complaint is timely filed. Hence, the question on this point is which limitations period applies.

## VI.    Analysis

### A.    Sections 523(a)(2)(A) and (a)(4)

> 1.    *Did the Debtor make a representation?*

The answer to this question is undoubtedly 'yes'. Mr. Delgado asked Ms. Patchell about the anticipated treatment of the Cecil Bank Lien before the settlement was held and whether it still had a balance and/or was to be paid off. Ms. Patchell responded that Cecil Bank had agreed to release its lien against Guilford Court and accept Cherokee as substitute collateral. She adopted Ms. Feltman's representation made on behalf of Cecil Bank that confirmed Cecil Bank's agreement, but that makes no difference as to her personal responsibility. *See Hudson Valley Water Res., Inc. v. Boice (In re Boice)*, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992) (interpreting

Section 523(a)(2)(B)).  The representation regarding the treatment of the Cecil Bank Lien was one of material fact, made to Conestoga Lancaster by Ms. Patchell.  Therefore, the first element is satisfied.

        2.     *Did the Debtor know at the time that the representation was false?*

The Bank's claim for relief against Ms. Patchell begins to crumble when the second question is examined.  Ms. Patchell's express representation was that Cecil Bank would release its lien against Guilford Court and accept Cherokee as substitute collateral.  When the entirety of the facts and circumstances are taken into account, it is plain that no reasonable fact-finder could conclude that Ms. Patchell knew the falsity of the statement at the time it was made.  This is so simply because the statement was not false.  As a reflection of Cecil Bank's intention, the statement was as true as true can be.  This conclusion is emphatically verified by Ms. Feltman's testimony and in particular her explanation of how she obtained authority to make the statement: from her brief, non-controversial exchange with Ms. Halsey, then President and CEO of Cecil Bank.  Ms. Patchell's request that the Cecil Bank Lien be released from Guilford Court and affixed to Cherokee was neither unusual nor unique; Ms. Feltman expressly confirmed that such an accommodation was a standard practice at Cecil Bank at the time.  Hence, Ms. Patchell accepted Cecil Bank's agreement, embodied in Ms. Feltman's email, at face value.  And the Court finds that Mr. Delgado did likewise.  There is no evidence that he was in any way concerned by the notion that the Cecil Bank Lien would be released and secured by substitute collateral to allow Ms. Patchell to receive the net proceeds.  His passivity seems to embody the conventional wisdom and high-flying, "fire, ready, aim," practice of the time.  It is evidence on par with Ms. Feltman's testimony as to the decidedly low industry standards of compliance and diligence, the same low standards that paved the way for the Great Recession.  Cecil Bank's

22

subsequent, arbitrary change of position ultimately undercut the agreement Ms. Feltman memorialized in the email. Nevertheless, it would be terribly wrong to find that Ms. Patchell "knew of the falsity" of the representation that embodied the agreement at the time it was made. That is so because the statement was an accurate reflection of Cecil Bank's intention at the time.

      3.     *Did Ms. Patchell make the statement with the intent and purpose of deceiving Conestoga Lancaster?*

The preceding finding of fact effectively answers the third question as well. As Ms. Patchell understood Ms. Feltman's statement to be true (and she was correct about that) the Court cannot find that she published it with a deceptive purpose. Instead, the Court finds that she obtained and published the statement in a sincere, honest effort to give Mr. Delgado the information he requested so he would be fully informed. Ms. Feltman, on behalf of Cecil Bank, believed the statement to be an accurate representation of her employer's intentions at the time she sent the email and she intended to follow through with the stated plan until it was derailed by Mr. Sposato's arbitrariness. There is no evidence that even suggests a contrary plan was afoot. Ms. Patchell was perfectly entitled to rely upon the accuracy of the statement and pass it on to Mr. Delgado. Hence, there was no intent to deceive with respect to the express representation that there would be a release and substitution of the Cecil Bank Lien.

Yet, Conestoga Lancaster puts a different spin on Ms. Patchell's obligation. It asserts she had a duty to tell Mr. Delgado before settling that she did not yet have in hand either the release or a substitute deed of trust and that her failure to do so constitutes intentional deception by omission. There are several problems with this argument. By Ms. Feltman's uncontradicted, and completely unbiased testimony, it was not unusual, and in fact normal at the time, for the sort of peripheral documents involved here – a release and substitute deed of trust – to be prepared and executed long after the settlement occurred. Thus, without evidence of any shady,

or even questionable, behavior on Ms. Patchell's part, there is no reason to conclude that she *purposefully* withheld this information from Mr. Delgado in order to deceive him in light of the fast-paced market place's disdain for compliance and fifth-rate level of diligence; it would be much more reasonable to conclude that she believed the documents would be provided within a reasonable time after the settlement.  The Court likewise concludes that Mr. Delgado would likely have believed exactly the same thing.  Mr. Delgado, acting in the role of escrow agent, held all the money and hence, all the cards – he retained that position in order to "supervise" the transaction and "give comfort" that there was no "impropriety" to all parties involved including especially his employer, Conestoga Lancaster.  He was on exactly the same plane of knowledge as Ms. Patchell (including knowledge of Conestoga Elkton's obligations under the Agreement) and, nevertheless, made the choice to release the money and fund the transaction, including the distribution of the net proceeds to Ms. Patchell.  He knew what Ms. Feltman wrote in her email and if he had a legitimate concern it would have been exceedingly simple for him to ask Ms. Patchell whether she had the release and substitute deed of trust.  If she answered "no", he could have withheld the money and put the settlement on hold until the documents were in hand.  That would have been precisely in line with the way he described his role and likely would have made for a "clean" settlement.[10]  The fact that he did not do so speaks to both the convincing nature of Ms. Feltman's representation as to what Cecil Bank promised to do and Mr. Delgado's understanding of a residential real estate market where releases were neither prepared nor recorded until well past the settlement date.

The Court, in *In re Lindsley,* 388 B.R. 661 (Bankr. D. Md. 2008), examined a claim of fraud by omission in the context of a Section 523(a)(2)(A) exception to discharge.  Summarizing prior case law, the opinion provides:

---

[10] Hindsight being 20/20.

24

> A misrepresentation can be any words or conduct which produce a false or misleading impression of fact in the mind of another. *In re Pleasants*, 231 B.R. 893, 897 (Bankr. E.D. Va. 1999). An omission may constitute a misrepresentation where the circumstances are such that a failure to speak or act creates a false impression. *Id.*

388 B.R. at 669.

*Lindsley* involved the plaintiffs' purchase of a large tract of land, a portion of which had been dedicated to the State of Maryland as an environmental easement. The easement carried with it an environmental mitigation credit bank, meaning that, with the State's oversight, valuable, yet virtual, credits could be sold by the owner to developers of other, unrelated parcels of land to "mitigate" the environmental impact of the unrelated parcel's development. *Id.* at 665. At the time of the sale of the real estate, the credit bank still had substantial value. However, the plaintiff buyers did not know that because the debtor, Mr. Lindsley, purposefully did not tell them. Instead he, (1) falsely asserted that he had already exhausted the mitigation credit bank by his sale of all the credits and (2) did not let the purchasers know that he intended to secretly continue to sell credits after the settlement as if he still owned the real estate. Hence, the exception of the debt from his discharge was grounded upon both the debtor's overt material misrepresentation as to whether the credits had been exhausted and his covert omission of material information regarding his intention to keep selling the mitigation credits. The evidence proved both active and silent deception by Mr. Lindsley – the credit bank was in existence and fungible at the time of settlement but he did not inform the buyers of that, nor did he tell them he would continue to sell the credits post-settlement. Finding intentional deception and fraud, in part by omission, by Mr. Lindsley was therefore easy.[11]

---

[11] The excepted debt was comprised of the gross proceeds Mr. Lindsley received from his post-settlement sale of the credits.

In this case, the opposite conclusion is just as easily reached. The facts and circumstances indicate that Ms. Patchell sincerely, and with good reason, believed Cecil Bank would follow through on its promise. That alone is enough to find she was not engaging in nefarious deception. Conversely, there are no indicators of either surreptitious, wrongful or murky conduct by her from which the Court can reasonably conclude that she acted with a deceptive purpose. Ms. Patchell asked Cecil Bank to release its lien and accept substitute collateral and they agreed. When Mr. Delgado asked her about the Cecil Bank Lien, she provided him with Ms. Feltman's confirmation of the bank's intention. Ms. Patchell subsequently worked hard to get Cecil Bank to keep its promise but Cecil Bank – its decision-making now controlled by Mr. Sposato's whim and caprice − would not. Two explanations were given for this change of heart. The first is Cecil Bank's assertion, included in Mr. Fayer's letter, that Cherokee did not have sufficient equity to support the Cecil Bank Lien. The second is Ms. Patchell's assertion that Mr. Sposato revoked Cecil Bank's promise as retribution for her refusal to sell him Conestoga Elkton. Ms. Feltman likewise attributes the decision to Mr. Sposato's arbitrary and capricious behavior and not the reason given in Mr. Fayer's letter. But the Court need not decide which is more likely because either supports an absence of fraudulent intent on the part of Ms. Patchell. In other words, both confirm that Cecil Bank did make the promise in question, that Ms. Patchell had at least colorable right to believe and rely upon it and that the promise was revoked as a result of circumstances beyond her control. This does not add up to the type of dark, concealed, half-truths and inventions that characterize fraudulent behavior. Ms. Patchell likely breached the strict language of the Agreement by failing to have the signed release and substitute deed of trust at settlement,[12] but that is well short of intentional, fraudulent

---

[12] Paragraph 4 of the Agreement requires:

behavior.  Moreover, in the context of the high-flying, pre-Great Recession times, where booking new deals outstripped common sense to the extent that the global economy was sacrificed on the altar of greed, it seems it would have been strange if the documents *had been* present at settlement.[13]  In any event, Ms. Feltman's confirmation of Cecil Bank's promise seemed to be more than good enough at the time for everyone to proceed and consummate the transaction.  Under these circumstances, the Court cannot find intentional deception, whether overt or covert, on the part of Ms. Patchell.

4.    *Did Conestoga Lancaster justifiably rely upon the false statements?*

As Ms. Feltman's representation (adopted by Ms. Patchell) was true, this fourth question likewise answers itself.  All of the actors took her email at face value and it was an accurate reflection of Cecil Bank's intention at the time it was made.  Nevertheless, Conestoga Lancaster contends that it detrimentally relied upon Ms. Patchell's omission of material information.  It avers that Mr. Delgado never would have released the proceeds or granted the title insurance had Ms. Patchell (acting fraudulently) told him she did not have the release and substitute deed of trust on the day of the settlement.  The Court cannot find that Conestoga Lancaster was justified in relying upon a belief that Ms. Patchell actually had the release and substitute deed of trust at settlement, because the Court cannot find that Mr. Delgado truly believed Ms. Patchell had the

---

Before closing or settlement, Agent shall:

(d) (1) secure … appropriate evidence or curative material justifying the removal of all objections set out in the binder or report of title except those remaining as an exception on the policy ….

(g) Agent agrees to promptly record all documents which are required to be recorded … and to be responsible for the satisfaction of such liens of record….

[13] Ms. Feltman also testified generally that a settlement agent would normally prepare a deed of trust and release and they would normally be executed prior to settlement.  Def. Exh. at 28-29; 13, 33-34.  Ms. Patchell disagreed.  However, Ms. Feltman also confirmed the specifics of Ms. Patchell's story, especially regarding the fast-paced market and lack of diligence.  Hence, the Court can only conclude that to the extent there is a contradiction, Ms. Feltman must have been referring to settlements funded by Cecil Bank.

release and substitute deed of trust that day.  To the contrary, the Court concludes it is far more

likely that Mr. Delgado understood, in light of the prevailing industry standards, that the

documents would be provided at a later date.  Nevertheless, assuming he did believe, then it was

incumbent upon Conestoga Lancaster to show such belief was justified.  Justifiable reliance

presents a lower hurdle than reasonable reliance.  *Field,* 516 U.S. at 70.  However, it nonetheless

presents a hurdle of substance.

In *Field*, the Court was called upon to determine whether reasonable, or justifiable,

reliance was the legislatively mandated standard under Section 523(a)(2)(A).  The Court held

that the common law standard in use for garden-variety state law fraud at the time of the original

statute's enactment[14] would be the correct one.  Hence, the Court looked to the precedential

overview included in the Restatement (Second) of Torts (1976) for guidance and determined that

because the majority of states applied a justifiable reliance standard, that was the proper one for

purposes of Section 523(a)(2)(A).  Explaining the difference between justifiable and reasonable

reliance, the Court stated:

> The Restatement expounds upon justifiable reliance by explaining
> that a person is justified in relying on a representation of fact
> 'although he might have ascertained the falsity of the
> representation had he made an investigation.'
>
> *            *            *
>
> Here a contrast between a justifiable and reasonable reliance is
> clear:  'Although the plaintiff's reliance on the misrepresentation
> must be justifiable … this does not mean that his conduct must
> conform to the standard of the reasonable man.  Justification is a
> matter of the qualities and characteristics of the particular plaintiff,
> and the circumstances of the particular case, rather than of the
> application of a community standard of conduct in all cases.'

*Field*, 516 U.S. at 70-71.

---

[14] *See* Section 17(a)(2) of the Bankruptcy Act of 1898.

Still, the Court recognized that the more "plaintiff-friendly" prism of justifiable reliance is not unlimited, holding, "[A] person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id*. at 71.

When these standards are applied to this dispute, the Court cannot find that Conestoga Lancaster's reliance was justified.  Mr. Delgado's self-described role was to insure the settlement unfolded with the interests of all, including those of his employer, protected.  He was in the position of power and control and had every right – perhaps a duty – to pull the plug if every element did not meet with his satisfaction.  Ms. Feltman's email was unmistakably clear – it is a no-nonsense summary of Cecil Bank's intentions.  However, she did not indicate in the email that the release and substitute deed of trust would be provided at the time of the settlement.  With that, Mr. Delgado had every right to stop the transaction and require the signed documents in advance of settlement.  At a minimum, if he thought the signed release and substitute deed of trust should have been present at the settlement table, then he should have asked about them before he released the money to Conestoga Elkton.  Because he did not, and in light of his self-described role and position of power, the Court finds that his failure to do so was not justifiable under the circumstances.

5.    *Was the debt obtained by the alleged fraud?*

For the reasons explained above, the Court concludes that the indebtedness was not obtained by fraud.  Conestoga Lancaster asserts that it had to pay Cecil Bank (and its own attorneys) in settlement to resolve the title dispute as a result of Ms. Patchell's fraud.  However, Ms. Patchell did not commit fraud and therefore there is no basis to except the debt from her

discharge under Section 523(a)(2)(A). While she likely breached the Agreement, or perhaps acted negligently, that type of liability is insufficient to gain an exception to discharge.[15]

6.      *Is there evidence of the requisite sort of intentional conduct by Ms. Patchell sufficient to except the debt from her discharge pursuant to Section 523(a)(4)?*

Assuming the funds released by Mr. Delgado were held in an express trust by Conestoga Elkton (if even briefly before the checks were written and disbursed) and that Ms. Patchell was acting as Conestoga Lancaster's fiduciary (and that the corporate shield cannot deflect her personal responsibility)[16] there would still be no evidence of intentional wrongdoing, or other equivalent conduct on her part sufficient to except the debt from her discharge under Section 523(a)(4). In the absence of intentional wrongdoing, the Supreme Court in *Bullock* held that the risk taken by the fiduciary, "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances know to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." 133 S. Ct. at 1760. For the reasons explained above, the Court cannot find either that Ms. Patchell's conduct was intentionally purposed to do wrong or that it was a "gross deviation from the standard of conduct" such that Section 523(a)(4) is satisfied. To the contrary, her behavior, and that of Mr. Delgado and Ms. Feltman, appears to have been in accordance with the mores of the market place at the time of the settlement – although her failure to have the release and substitute deed of trust at settlement likely violated the Agreement, it was not a gross

---

[15] In a similar vein, Conestoga Lancaster likely breached its contractual obligation to Conestoga Elkton under the Agreement by failing to consult with it as to the settlement discussions with Cecil Bank and its ultimate decision to settle. See Pl. Exh. 1 at ¶5 ("Conestoga [Lancaster] agrees to consult with [Conestoga Elkton] prior to making final decision on losses on policies issued by [Conestoga Elkton]"). By the same token, it appears Conestoga Lancaster retains unfettered discretion to settle.

[16] *See Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266, 271 (4th Cir. 2002) ("while an officer of a corporation is in no way personally liable for corporate torts solely on account of his corporate position, where the officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie").

deviation from the standard of conduct that "law-abiding" people decided to observe at the time. If it were, the jail cells would today be filled to bursting with individuals clad in silk, designer suits.

Conestoga Lancaster asserted that Ms. Patchell could be held liable, and the debt excepted from her discharge under Section 523(a)(4), on the basis of her negligent breach of contract.  Conestoga Lancaster relied upon *Rwanda v Uwimana*, 274 F. 3d 806 (4th Cir. 2001) in support of this position.  It is true that the legal standard expressed in that case may have helped Conestoga Lancaster and pointed the way to a different result.  However, *Uwimana's* holding – that a fiduciary's debt could be excepted from discharge under Section 523(a)(4) without a showing of intentional conduct – was expressly rejected by *Bullock*.  Without facts that support either intentional conduct or a "gross deviation" from the appropriate standard of conduct, Conestoga Lancaster cannot prevail under Section 523(a)(4).  Because there is no such evidence, the debt will not be excepted from Ms. Patchell's discharge.

### B.   Statute of Limitations

#### 1.   *Is Conestoga Lancaster's claim against Mr. McCoy barred by the three year statute of limitations?*

The statute of limitations begins to run when a cause of action accrues.  *Bass v. Standard Acc. Ins. Co.,* 70 F.2d 86, 87 (4th Cir. 1934).  A guarantor's promise under a guaranty becomes absolute and enforceable – and hence the cause of action against her accrues – upon the default of the principal and the proper triggering of the guaranty obligations.  *Mercy Med. Ctr. v United Healthcare of the Mid-Atlantic,* 149 Md. App. 336, 358 (2003).[17]  Thus, the limitations period

---

[17] The Agreement expressly indicates that it is governed by Pennsylvania law.  Pl. Exh. 1 at ¶17.  The Guaranty does not include a choice of law provision.  Nevertheless, and notwithstanding its reliance upon the sealed Agreement in order to assert a 12 year limitations period, Conestoga Lancaster does not assert that Pennsylvania law must apply to this dispute.  Instead, both sides exclusively rely upon Maryland law with respect to the limitations question.

begins to run from the time the guarantor is liable for suit and that occurs when the principal

becomes liable for the debt guaranteed. *Allied Funding v Huemmer,* 96 Md. App. 759, 763

(1993) ("the statute of limitations on a contract of guaranty cannot begin to run until a right of

action accrues on the principal debt").

Contrary to the express terms of the Agreement, Ms. Patchell did not have the release and

substitute deed of trust on April 30, 2007, the day of settlement.  Conestoga Lancaster asserts

that it believed Ms. Patchell did have the documents that day.  Whether that belief existed or not,

the evidence confirms that Mr. Delgado knew by no later than July 27, 2007 that the Cecil Bank

Lien still had not been released from Guilford Court.  That was the day he sent Ms. Patchell an

email inquiring about the Cecil Bank Lien which was still of record and telling her that it needed

to be "satisfied/released as to Guilford Ct."  Pl. Exh. 7.  At that point in time, both the breach and

Conestoga Lancaster's knowledge of it could not be reasonably denied.  Accordingly, the Court

finds that the claim for relief against Mr. McCoy under the Guaranty accrued on the day of

settlement and, at the very latest, on July 27, 2007.  That being the case, the limitations period

began to run on Conestoga's claim against Mr. McCoy on the same day.[18]

A contract of guaranty is collateral to, and independent of, the principal contract.

*General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 260 (1985); *Kushnick v Lake Drive*

*Bldg. & Loan Ass'n,* 153 Md. 638, 641 (1927).  Likewise, one's status as a guarantor does not,

without more, make one a party to the principal obligation.  *Id.*  As stated in *Kushnick*:

> The guaranty is a separate and independent contract, involving
> duties and imposing responsibilities very different from those
> created by the original contract to which it is collateral. The fact
> that both contracts are written on the same paper or instrument
> does not affect their separate nature.

---

[18] In its post-trial memoranda, Conestoga Lancaster appeared to agree that the claim accrued on April 30th.  *See* Pl. Mem. in Opp. to Def. Mt. Summ. J. at 19 (Dkt. No. 26); Pl. Mem. re: Pers. Guar. at 8 (Dkt. No. 32).

*Id.* at 642 (citation omitted).

Notwithstanding the fact that two separate contracts are presented – one under seal and the other not – Conestoga asserts that Mr. McCoy's liability should be governed by the Agreement he did not sign in order to trigger the hoped for extended limitations period. Conestoga stated, "Mr. McCoy guaranteed the performance of the [Agreement] by the Agent. The Agency Agreement is an instrument executed under seal. As such, it is a specialty under Maryland law and subject to a 12 year statute of limitations, rather than an ordinary 3 year period for breach of contract." Pl. Mem. in Opp. to Def. Mt. Summ. J. at 10 (Dkt. No. 26). Conestoga Lancaster relies upon *Hooper v Hooper*, 81 Md. 155, 174 (1895) to make this contention.

It is true that *Hooper* in part held that, "the liability of a guarantor is coextensive with the liability of the principal". *Id.* at 173-74. From that, Conestoga Lancaster asserts that as long as the debt is enforceable against the principal, it is enforceable against the guarantor. However, to apply that language literally here would be to ignore context and meaning. While it is somewhat convoluted factually, *Hooper* is easily distinguishable from this dispute.

In *Hooper*, three brothers guaranteed the debt of a fourth that arose from sums lent to him by a manufacturing company formerly owned by their late father. *Id.* at 165. The guaranty was dated April, 1889. In March 1894, the manufacturing company demanded payment from William, the indebted brother, and also from the guarantors. In turn, two of the guaranteeing brothers told Alcasus, the defendant and co-guarantor, that they were going to pay William's debt and demanded contribution. When Alcasus was sued by his fellow guarantors, he asserted that the statute of limitations had already expired as either three years had passed since the execution of the guaranty, or, since the date of the last loan to William.

The Court held that limitations does not begin to run "in favor of a . . . guarantor [until] he is liable to suit, and this may or may not be the same time the principal becomes so liable." *Id.* at 170. The Court employed conditional language because the guaranty included a notice requirement and grace period. However, the simple essence of the holding is that the cause of action against the guarantors did not accrue until William went into default and then only after the grace period expired. Hence that is when the limitations period began to run; not when the guaranty was executed, approximately five years before. The Court did use the language quoted by Conestoga Lancaster regarding the "coextensive-ness" of the guarantor's liability with that of the principal, but that was merely to make the point that limitations had not run in favor of William, the principal obligor. *Id.* at 172. The case did not hold that the twelve year limitations period can be used to breathe life into a collateral, unsealed document.

*Hooper's* rationale cannot be conflated to give Conestoga Lancaster what he needs – a ruling that its claim against Mr. McCoy is governed by the twelve year statute of limitations. The Guaranty and the Agreement are two separate agreements. Mr. McCoy signed the Guaranty and admitted he is otherwise bound by it. However, he signed the Agreement only as a witness to Ms. Patchell's signature but not as a party. Conestoga Lancaster's claim for relief accrued against him on April 30, 2007 and the limitations period began to run then. Because he is not a party to the sealed Agreement, his liability has to be governed by the Guaranty and because it is not under seal, the general three year limitations period applies. Therefore, the Complaint against him must be dismissed.[19]

---

[19] Limitations would also appear to run in favor of Ms. Patchell. The Defendants also rely upon the doctrine of "equitable estoppel", derived from *Hill v. Cross Country Settlements, LLC, 402 Md. 281 (2007)*. In short, the contention is that Conestoga Lancaster should not be allowed to enforce its claim against either of the Defendants due to its "voluntary conduct" in settling the claim with Cecil Bank. However, the doctrine does not apply where (1) a plaintiff acts under a legal compulsion or duty, or (2) acts to protect his or her own property interests. *Hill*, 402 Md. at 305. The Court finds that Conestoga Lancaster was operating under a legal compulsion (and perhaps also to

**Conclusion**

For the above articulated reasons, the underlying debt incurred by Conestoga will not be excepted from the Debtor's discharge nor will Mr. McCoy be found liable under the Guaranty. A separate judgment order will issue.

**End of Opinion**

---

protect its own property interests) when it settled with Cecil Bank because of the title insurance it gave to Mr. Powell.